1

2

3

4

5

6

7

8                     IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DARIN L. FRISBIE,

11            Plaintiff,                    No. CIV S-07-1172 GGH

12       vs.

13   MICHAEL J. ASTRUE,
     Commissioner of Social
14   Security,
                                                ORDER
15
              Defendant.
16   _____/

17            Plaintiff seeks judicial review of a final decision of the Commissioner of Social

18   Security ("Commissioner") denying plaintiff's applications for Disability Insurance Benefits

19   ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

20   Security Act ("Act").[1]  For the reasons that follow, plaintiff's Motion for Summary Judgment

21   and/or Remand is denied, the Commissioner's Motion for Summary Judgment is granted, and the

22   Clerk is directed to enter judgment for the Commissioner.

23   _____

24         [1]  The record reflects a statement by plaintiff to his treating source that he won $1.2
     million in the lottery.  (Tr. at 280.)  Upon direction by the court, plaintiff filed a declaration
25   stating that he had made this statement, but later discovered that he had not won anything.
     Frisbie Decl., filed August 27, 2008.  Therefore, plaintiff's application for SSI will not be
26   disturbed.

BACKGROUND

Plaintiff, born June 14, 1962, protectively applied for disability benefits on July 22, 2004. (Tr. at 14, 53.)  Plaintiff alleged he was unable to work since January 5, 2004, due to degenerative disc disease of the cervical and lumbar spine and degenerative joint disease of the knees.  (Tr. at 16.)

In a decision dated October 11, 2006, ALJ Stanley R. Hogg determined that plaintiff was not disabled.[2]  The ALJ made the following findings:

> 1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.
>
> 2.   The record does not establish that the claimant has engaged in substantial gainful activity since January 5, 2004, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.).*

---

[2] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq.   Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).  A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:

> Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
> Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.
> Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.
> Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.
> Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

3.      The claimant has the following severe impairments: degenerative disc disease of the lumbar and cervical spine and early degenerative joint disease of the knees (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work with occasional stooping and climbing.  Light work involves lifting no more than 20 pounds at a time, with frequent lifting or carrying of objects weighing up to 10 pounds.  The full range of light work requires standing or walking off and on for a total of approximately 6 hours of an 8 hour work day.  The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent stooping (Social Security Ruling 83-10).

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on June 14, 1962 and is currently 44 years old, which is defined as a younger individual age 18-44 (20 CFR 404.1563 and 416.963).[3]

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled" (See 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's  age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c),

[3] The ALJ referenced plaintiff's age of 44 as being a younger individual between the ages of 18 and 44; however, this category comprises individuals between the ages of 18 and 49.  20 CFR Part 404, Subpart P, Appendix 2, § 200.00(h)(1).  Therefore, there is no need to consider whether this is a borderline situation, which requires looking to a more favorable (higher age) grid, as Rule 202.21 applied by the ALJ covers ages up to 49.

3

1   404.1566, 416.960(c), and 416.966).

2       11.    The claimant has not been under a "disability," as defined
               in the Social Security Act, from January 5, 2004 through
3              the date of this decision (20 CFR 404.1520(g) and
               416.920(g)).
4

5   (Tr. at 16-21.)

6   ISSUES PRESENTED

7           Plaintiff has raised the following issues:  A.  Whether the ALJ's Assessment of

8   Plaintiff's Residual Functional Capacity is not Supported by Substantial Evidence; B.  Whether

9   the ALJ Improperly Rejected Plaintiff's Credibility; and C.  Whether the ALJ Improperly

10  Rejected the Statement of Plaintiff's Lay Witness.

11  LEGAL STANDARDS

12          The court reviews the Commissioner's decision to determine whether (1) it is

13  based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

14  the record as a whole supports it. Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999).

15  Substantial evidence is more than a mere scintilla, but less than a preponderance.  Saelee v.

16  Chater, 94 F.3d 520, 521 (9th Cir. 1996).  "'It means such evidence as a reasonable mind might

17  accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 402, 91 S. Ct.

18  1420 (1971), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206

19  (1938).  "The ALJ is responsible for determining credibility, resolving conflicts in medical

20  testimony, and resolving ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir.

21  2001) (citations omitted).  "Where the evidence is susceptible to more than one rational

22  interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."

23  Thomas v. Barnhart, 278  F.3d 947, 954 (9th Cir. 2002).

24  \\\\\

25  \\\\\

26  \\\\\

4

ANALYSIS

    A.  Residual Functional Capacity

        Plaintiff claims that the RFC adopted by the ALJ is not supported by substantial evidence.  Here, the ALJ found that plaintiff could do light work with occasional stooping and climbing, so that the base of light work was not significantly eroded.  (Tr. at 20.)  Plaintiff claims the evidence contradicts the finding that he can stand or walk for six hours and sit for at least six hours in a work day.  Aside from the credibility issues, discussed *infra*, plaintiff points to the radiological findings indicating the source of pain and inability to function, as well as his prescribed treatments which are indicated for severe pain.

        A CT scan, dated November 11, 2004, indicated posterior narrowing and anterior widening of the disc spaces at L3-4 and diffuse narrowing at L5-S1.  (Tr. at 390.)  The impression was "degenerative disc disease at L3-4 and L5-S1 with facet arthropathy and bony overgrowth about the disc margins causing mild to moderate narrowing of the neural foramina as above."  (Id.)

        An MRI of the lumbar spine on December 17, 2004 indicated the following:

> 1.  There is mild broad-based posterior disc bulge with a probable superimposed tiny left paracentral disc protrusion at L2-3.  This posteriorly displaced the descending left L3 nerve root by a few millimeters, but does not appear to result in any significant central or foraminal stenosis.
> 2.  There are scattered changes of degenerative disc disease within the lumbar spine, as described above.
> 3.  There is moderate right neural foraminal narrowing and borderline left neural foraminal narrowing at L5-S1 secondary to posterior spondylitic ridging.

(Tr. at 388.)

        A cervical CT scan on December 20, 2005, indicated spondylosis with varying degrees of foraminal narrowing, being severe at C4-5 on the left.  There was a disc bulge at C6-7, mild degenerative disc disease at C4-5 and C5-6, but no focal disc herniations.  (Tr. at 385.)

\\\\\

1       Although these records indicate changes which may be the cause of disability, the

2   mere fact of degenerative changes is not presumptive of disability.  See www.back.com

3   ("degenerative disc disease is as certain as death and taxes" and is a product of aging; it does not

4   necessarily produce pain or other symptoms).  The ALJ properly considered other evidence as

5   well.  On September 9, 2004, Dr. Crawford completed a form on plaintiff's musculoskeletal

6   condition, finding that plaintiff had swelling in the right knee and chronic low back pain, but

7   there were no abnormalities in sensation, reflex or motor areas.  There was no atrophy and no

8   abnormalities in range of motion and no joint instability.  (Tr. at 17, 219.)  This doctor was of the

9   opinion that plaintiff did not need an assistive device, and could walk a "normal amount."  (Id. at

10  220.)  The ALJ addressed plaintiff's knee pain and Dr. Crawford's note that it was intermittent

11  and its etiology was unclear.  Dr. Crawford also stated that plaintiff's back pain was temporarily

12  improved with epidural steroid injections.  (Tr. at 19, 221.)

13      The ALJ discussed Dr. Kumar's opinion of April 18, 2005, that plaintiff had a

14  normal gait and normal neurological findings, and that straight leg raising was negative for

15  radiculopathy.  (Id. at 17, 235-36.)  Although cervical range of motion was normal, lumbar range

16  of motion was restricted, and there was definite evidence of lumbar radiculopathy.  (Id. at 237.)

17  Motor strength, reflexes, and sensation were normal.  (Id. at 236.)  Dr. Kumar found that plaintiff

18  could lift 50 pounds occasionally and 25 pounds frequently, could stand and walk for six hours,

19  and could sit for an unlimited length of time with a proper supportive chair, with occasional

20  stooping and bending, in light of plaintiff's decreased range of motion and some tenderness in

21  the lumbosacral spine.  (Id. at 19, 235, 237.)   This physician also noted that plaintiff's bowel and

22  bladder incontinence did not seem to be related to his back pain, based on the MRI and

23  neurological findings.  He added that plaintiff was not using an assistive device to ambulate.  (Id.

24  at 237.)

25      The DDS review on September 23, 2004, indicated that plaintiff could do light

26  work with occasional climbing and stooping, and the ALJ also took this report into account.  (Tr.

1   at 19, 232, 256-63.)

2           The ALJ discussed plaintiff's ongoing treatment for pain with Drs. Orloff and

3   Sowerby.  The ALJ first referenced Dr. Orloff's findings of normal strength and neurological

4   findings.  (Id. at 17, 334, 355.)  The ALJ took note of numerous epidural steroid blocks for the

5   cervical and lumbar spine, and concluded that plaintiff achieved control of his pain through these

6   injections and other pain medication.  There are multiple references to improvement as a result.

7   (Tr. at 19, 184, 293, 308, 318, 329, 331.)   Plaintiff reported to treating sources that medication

8   worked well, and controlled and improved his pain.  (Id. at 318, 329, 331.)  He also received

9   good relief from the epidural blocks.  (Id. at 155.)  However, the record does not show the

10  improvement in pain control at the end of 2005 and into 2006 as the ALJ suggests.  In fact, the

11  record is replete with repetitive complaints of pain throughout the years, especially in 2005 and

12  2006.  (Tr. at 269 - pain is a 9/10.); (tr. at 271 - same intensity in 2006); (tr. at 275 - little pain

13  relief with Duragesic); (tr. at 277 - limited range of motion, secondary to pain); (tr. at 283 - pain

14  is 8/10); (tr. at 293 - in 2003 and 2004, pain ranged from 5/10 to 7/10); (tr. at 300 - pain down to

15  ankle on right and buttock on left); (tr. at 312 - Duragesic patch only gives relief for two days);

16  (tr. at 313 - referral for pain management); (tr. at 314 - pain poorly controlled); (tr. at 315 -

17  chronic neck and back pain); (tr. at 324 - increasing neck pain); (tr. at 327 - pain level stable at

18  7/10); (tr. at 329 - pain increased recently but medicines working well); (tr. at 334 - "intractable

19  pain"); (tr. at 338 - knee pain increasing over time); (tr. at 347 - pain worse so Norco prescription

20  increased); (tr. at 356 - plaintiff reported epidurals help but do not decrease pain very much).

21  These records indicate that the ALJ's summation of improved pain control was not accurate.

22  Nevertheless, even when plaintiff is credited with the full level of pain as consistently described

23  throughout the records, there is still substantial evidence that he can do some work.  Plaintiff

24  failed to obtain a residual functional capacity assessment from any treating source and therefore

25  \\\\\

26  \\\\\

the ALJ properly relied on the RFC assessments by Dr. Kumar and the DDS.[4]

Plaintiff also asserts that his need to recuperate for two to three days after each epidural steroid block would prevent him from keeping a regular work schedule.  Plaintiff's characterization of Dr. Sowerby's instructions on this issue is not entirely accurate.  This doctor instructed plaintiff to rest for the remainder of the day on which he received the epidural block, and to begin easy walking and/or swimming on the day after the procedure.  (Tr. at 272.)  These instructions were the same for all of the epidural blocks.  (Id. at 285, 287, 295, 297, 299.)

Plaintiff also claims that the ALJ failed to adequately develop the record in regard to plaintiff's bowel and urinary incontinence, and that this limitation would affect his RFC.  The ALJ's opinion did not specifically discuss this problem; however, the record is clear in indicating that there was no reason to further develop the record in this regard.  The ALJ stated that Dr. Orloff did refer plaintiff to a neurosurgeon at one point, but plaintiff did not follow through.  (Id. at 19, 347.)  The record reveals that Dr. Sowerby thought that plaintiff's complaints of incontinence were not related to his back as her exam did not indicate a significant herniation of the disc.  (Tr. at 166.)  Dr. Kumar also thought that based on the MRI and neurological findings, the incontinence was not related to plaintiff's back problems.  (Id. at 237.)  On June 7, 2005, the neurosurgeon's office called plaintiff's treating doctor to relate that the MRI was not impressive on the subject of bowel and bladder incontinence, and that plaintiff should see a urologist if he continued to have problems.  (Id. at 341.)  On June 29, 2005, plaintiff reported that his incontinence was becoming more sporadic.  At this time, the neurosurgeon refused to see

_____

[4]  Dr. Orloff did determine plaintiff disabled for purposes of rental assistance with the Department of Housing and Community Action; however, the standards for that determination are different from those required in a Social Security determination, and a conclusion of this sort without discussion is not binding on this court.  (Tr. at 323.)  "A statement by any physician that the claimant is disabled or unable to work is a conclusion on the ultimate issue to be decided . . . and is not binding on the [ALJ] in reaching his determination as to whether the claimant is disabled within the meaning of the [Act]."  Murray v. Heckler, 722 F.2d 499 (9th Cir. 1983), (citing Burkhart v. Bowen, 856 F.2d 1335 (9th Cir. 1988), 20 C.F.R. §§ 404.1527 and 404.927); accord, Magallanes v. Bowen, 881 F.2d 747, 750-51 (9th Cir. 1989).

1  plaintiff as the incontinence was decreasing.  (Tr. at 338.)   On August 10, 2004 and January 25,

2  2006, plaintiff denied any loss of bowel or bladder control.  (Tr. at 150, 275.)   The record does

3  not indicate any other treatment or follow through for this problem.  Therefore, the ALJ was not

4  required to further develop the record based on the aforementioned documentation.

5         B. Whether the ALJ Properly Assessed Plaintiff's Credibility

6         Plaintiff asserts that the ALJ did not properly address his credibility by rejecting

7  his pain testimony and finding that his pain had improved and was under control.

8         The ALJ determines whether a disability applicant is credible, and the court defers

9  to the ALJ who used the proper process and provided proper reasons.  See, e.g., Saelee v. Chater,

10  94 F.3d 520, 522 (9th Cir. 1995).  If credibility is critical, the ALJ must make an explicit

11  credibility finding.  Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v.

12  Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be

13  supported by "a specific, cogent reason for the disbelief").

14         In evaluating whether subjective complaints are credible, the ALJ should first

15  consider objective medical evidence and then consider other factors.  Bunnell v. Sullivan, 947

16  F.2d 341, 344 (9th Cir.1991) (en banc).  The ALJ may not find subjective complaints incredible

17  solely because objective medical evidence does not quantify them.  Id. at 345-46.  If the record

18  contains objective medical evidence of an impairment possibly expected to cause pain, the ALJ

19  then considers the nature of the alleged symptoms, including aggravating factors, medication,

20  treatment, and functional restrictions.  See id. at 345-47.  The ALJ also may consider the

21  applicant's: (1) reputation for truthfulness or prior inconsistent statements; (2) unexplained or

22  inadequately explained failure to seek treatment or to follow a prescribed course of treatment;

23  and (3) daily activities.[5]  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see generally

24

25        [5] Daily activities which consume a substantial part of an applicants day are relevant.
    "This court has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily

26  activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in

1   SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-01; SSR 88-13.  Work records, physician

2   and third party testimony about nature, severity, and effect of symptoms, and inconsistencies

3   between testimony and conduct, may also be relevant.  Light v. Social Security Administration,

4   119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may rely, in part, on his or her own observations,

5   see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir. 1989), which cannot substitute for

6   medical diagnosis.  Marcia v. Sullivan, 900 F.2d 172, 177, n.6 (9th Cir. 1990).  Absent

7   affirmative evidence demonstrating malingering, the reasons for rejecting applicant testimony

8   must be clear and convincing.  Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595,

9   599 (9th Cir. 1999).

10              In this case, plaintiff had testified that prolonged sitting, walking and standing

11  cause pain.  The ALJ first stated that the evidence suggested plaintiff's impairments could not

12  produce the level, limiting effects and persistence of pain as testified to by plaintiff, and his

13  statements were not entirely credible.  (Tr. at 18.)  The major problem with the ALJ's analysis is

14  his mischaracterization of improvement in pain at the end of 2005 and 2006 as outlined in the

15  previous section.  (Tr. at 19.)  The treating records indicate for the most part that the pain did not

16  improve, with a few reports of pain control and improvement.  See discussion supra.  As

17  concluded in the previous section, the remainder of the evidence indicates that plaintiff can do

18  some work.  The rest of the ALJ's credibility findings were proper in any event.  In regard to

19  plaintiff's knee problems, the ALJ properly noted that Dr. Crawford prescribed conservative

20  treatment including medication and ice packs only.  Dr. Crawford stated that the knee pain was

21  intermittent and its etiology was unclear.  (Id. at 19, 221.)  No assistive device was needed, and

22  this doctor found that plaintiff could walk a "normal amount" without one.  (Tr. at 220.)  Dr.

23  Crawford also noted that plaintiff achieved "temporary improvement of sacriliac joints with

24  ————————————

25  any way detract from her credibility as to her overall disability.  One does not need to be utterly

26  incapacitated in order to be disabled."  Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001)
    (quotation and citation omitted).

1   cortisone injections."  (Id. at 221.)

2           The ALJ also referred to the records referred to in the previous section regarding

3   evidence contradicting plaintiff's claims of limited residual functional capacity, including

4   objective findings of intact strength and lack of neurological deficits.  (Id. at 19.)  He further

5   noted the referral to a neurosurgeon, but that plaintiff did not follow through.  (Id.)

6           Aside from the medical evidence, the ALJ made much of the fact that claimant

7   had an online marketing business and although sedentary in nature and not relevant to functional

8   capacity, what was relevant was plaintiff's failure to mention this business despite close

9   questioning by the ALJ at the hearing.  (Id. at 19.)  Plaintiff testified that he woke up one

10  morning and he had to crawl around on his hands and knees and that was the end of his career.

11  (Id. at 397.)  He testified that the last day he worked was December, 2003, and when the ALJ

12  asked him if he had worked since that time, he responded that he had not.  (Id.)  Plaintiff had

13  reported to Dr. Sowerby on September 16, 2004, and January 25, 2006 that he had an online

14  marketing business that was growing somewhat.  (Tr. at 276, 301.)

15          The ALJ also reviewed plaintiff's daily activities which included some household

16  chores such as washing dishes.  He could drive 10 to 15 minutes.  He also socialized, attended

17  his daughter's sporting events, went to church and the grocery store.  (Id. at 18.)  Although

18  plaintiff was generally sedentary throughout the day, the ALJ opined that it was not necessarily

19  due to medical necessity.  (Id. at 19.)

20          Also pertinent to this discussion is a notation by plaintiff's treating doctor that

21  despite prescriptions and refills for narcotic and opiate based pain medications, urine screening

22  indicated no narcotics or opiates in his system.  Dr. Orloff stated that the urine tox screen would

23  be repeated and if negative again, "will need to have a serious discussion with this patient with

24  regards to his pain medication usage or possible diversion."  (Id. at 316.)  Although the

25  \\\\\

26  \\\\\

11

1   medications prescribed were for moderate to severe pain,[6] this notation places doubt on

2   plaintiff's need for this serious medication if he was not taking it.

3           Furthermore, although the epidural blocks and narcotic medication (assuming

4   plaintiff was taking it), indicate that plaintiff has serious problems, his condition was not totally

5   disabling as evidenced by the lack of more serious treatment such as recommendation for surgery

6   or prescription for a cane.  In fact, the neurosurgeon opined that plaintiff's MRI was "not too

7   impressive" and he was not a candidate for surgery.[7] (Id. at 341.)  Although plaintiff reported to

8   Dr. Kumar that he uses a cane and crutches all the time, he did not use them for walking at that

9   appointment, and as mentioned above, Dr. Crawford, plaintiff's knee specialist, opined that

10  plaintiff did not need an assistive device.  (Tr. at 233, 237, 220.)  This opinion was confirmed by

11  the DDS physician.  (Id. at 257.)  Dr. Orloff's records do not indicate the need for an assistive

12  device.  Most recently, Dr. Orloff noted that plaintiff walked without a limp.  (Tr. at 312.)

13  Plaintiff's credibility is somewhat suspect for this reason also.

14          An additional factor to consider is the failure to seek treatment.  Smolen, 80 F.3d

15  at 1284.  Dr. Orloff noted on numerous occasions that plaintiff was a no show for his

16  appointments.  The situation deteriorated so much that this treating doctor had a talk with

17  plaintiff, ordered that no further appointments could be made for a period of six months, and that

18  plaintiff would be accepted on a walk-in basis only.  (Tr. at 324.)

19          The ALJ properly evaluated plaintiff's pain testimony, and the record supports his

20  analysis.

21  \\\\\

22  \\\\\

23  _____

24      [6] Norco and the duragesic patch are prescribed for moderate to severe pain.
    www.drugs.com; www.duragesic.com.

25

26      [7] Plaintiff had suffered a motorcycle accident in 1980, but never had surgery on his back.
    He did have right knee surgery, however, in 1979.  (Tr. at 233.)

C.  Lay Witness Statement

Plaintiff claims that the ALJ summarily dismissed the witness statement of plaintiff's friend, Cindi Dorn.  An ALJ is required to "consider observations by non-medical sources as to how an impairment affects a claimant's ability to work."  Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987).  "Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so."  Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001) (citing Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996)).  Similar to the ALJ's role in evaluating the testimony of a claimant, when evaluating the testimony of a lay witness "[t]he ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."  Sousa v. Callahan, 143 F.3d 1240, 1243 (9th Cir. 1998) (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The Ninth Circuit has recently held that the ALJ must properly discuss lay witness testimony, and that any failure to do so is not harmless unless no reasonable ALJ, when fully crediting the testimony, could have come to a different disability determination.  Stout v. Commissioner, 454 F.3d 1050, 1053 (9th Cir. July 25, 2006).

In this case, the ALJ opined that Ms. Dorn's statement was not credible for the same reasons he found plaintiff to be not fully credible.  (Tr. at 19.)  Ms. Dorn's statement was under oath and repeated many of the same limitations as alleged by plaintiff in his testimony.  (Tr. at 79-87.)  Those limitations have been discussed in the previous section, and were properly addressed by the ALJ.  For example, Ms. Dorn stated that plaintiff needs a wheelchair to ambulate when he cannot walk.  (Id. at 85.)  The medical sources of record dispute that plaintiff needs a cane, let alone a wheelchair.  See discussion *supra*.

Ms. Dorn also stated that she and plaintiff's children do chores around the house.  Plaintiff's activities are limited to eating, showering, reading, watching television, sleeping and visiting with her.  (Id. at 79-80.)  According to Ms. Dorn, plaintiff sometimes takes care of his

own personal needs, does not drive due to the effects of his medication, and does not cook or do

chores.  (Id. at 80-81.)   The ALJ discussed this statement and properly rejected it as set forth in

the previous section.

CONCLUSION

            Accordingly, plaintiff's Motion for Summary Judgment and/or Remand is

DENIED, the Commissioner's Cross Motion for Summary Judgment is GRANTED, and the

Clerk is directed to enter Judgment for the Commissioner.

DATED: 09/10/08

                                        /s/ Gregory G. Hollows
                                        _____
                                        GREGORY G. HOLLOWS
                                        U.S. MAGISTRATE JUDGE

GGH/076
Frisbie1172.ss.wpd

14